Glen L. Kulik (SBN 082170)
Natalie N. Mutz (SBN 273381)
KULIK GOTTESMAN & SIEGEL, LLP
15303 Ventura Boulevard, Suite 1400
Sherman Oaks, California  91403
Telephone:  (310) 557-9200
Facsimile:   (310) 557-0224
gkulik@kgslaw.com; nmutz@kgslaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN FRIEDMAN and FSZ MEDIA, LLC,<br><br>　　　　　　Plaintiffs,<br><br>　v.<br><br>DIRECTV, a Delaware corporation; DIRECTV HOLDINGS, LLC, a Delaware limited liability company; and DOES 1 through 10, inclusive,<br><br>　　　　　　Defendants. | CASE NO.:<br><br>**COMPLAINT FOR**<br><br>**1. BREACH OF IMPLIED-IN-FACT CONTRACT**<br><br>**2. BREACH OF CONFIDENCE**<br><br>**3. FRAUD**<br><br>**4. NEGLIGENCE**<br><br>**[Demand for Jury Trial]** |

{00258378;1}

1

COMPLAINT

Plaintiffs allege:

## THE PARTIES

1.   Plaintiff Steven Friedman ("Friedman") is an individual who is a resident of and domiciled in the State of Florida.

2.   Plaintiff FSZ Media, LLC is a limited liability company formed under the laws of the State of Florida with its principal place of business located in Florida.

3.   Defendant DIRECTV is a corporation formed under the laws of the State of Delaware with its principal place of business located in El Segundo, California.

4.   Defendant DIRECTV Holdings, LLC is a limited liability company formed under the laws of the State of Delaware with its principal place of business located in El Segundo, California.

5.   Plaintiffs are unaware of the true names or capacities of those defendants named in this pleading as Does 1 through 10 and for that reason each such defendant is sued under a fictitious name. Plaintiffs will amend this Complaint when their true names and capacities have been ascertained.

6.   Plaintiffs are informed and believe, and on that basis allege, that each of the defendants named in this pleading as Does 1 through 10 have a legal relationship with the above-named defendants such that they are liable for the contractual debts and other acts and omissions of the named defendants. For that reason, and/or other legal reasons, they are liable for the damages suffered by Plaintiffs as alleged below.

7.   All defendants referenced above are collectively referred to below as "DIRECTV."

8.   Plaintiffs are informed and believe, and on that basis alleges, that at all times mentioned in this Complaint each defendant was the agent, servant, and employee of each other defendant, acting within the course and scope of his, her, or its agency and employment with the full knowledge, consent, and ratification of each other defendant.

## JURISDICTION AND VENUE

9. The Court has subject matter jurisdiction over this action by virtue of the provisions of 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

10. Venue is proper in this action under the provisions of 28 U.S.C. § 1391(a). Defendants reside in this judicial district which is also the location where the acts and omissions of defendants giving rise to the claims alleged below occurred.

## THE FACTS

11. Defendants are broadcast satellite service providers that transmit digital satellite television signals throughout the United States to approximately 20,000,000 customers. Defendants have been engaged in this business since in or about 1994.

12. DIRECTV offers programming on a non-exclusive basis that it licenses from independent third party cable and broadcast networks and other service providers, including, for example, major television networks such as NBC, CBS, Fox, and ABC, cable channels such as USA, FX, Hallmark Channel, Bravo, MTV, HBO, Showtime, Lifetime Channel, and many others.

13. In 2012, Friedman, an experienced and highly regarded professional in the broadcast, cable, satellite, and telecommunications industries for over 30 years, created the idea of a television channel, which he referred to as the Fantasy Sports Zone ("FSZ"), that would be dedicated entirely to fantasy sports covering the entire United States rather than on a local or regional basis. He contacted Toby Berlin ("Berlin"), Vice President of Programming Acquisitions for DIRECTV, whom he knew from previous business transactions he worked on with Berlin and other employees of DIRECTV. Berlin's job was to seek out and negotiate new opportunities for DIRECTV to expand the programming it could offer to DIRECTV customers. During the conversation, he told Berlin he had an idea for a fantasy sports network and asked if DIRECTV had ever been pitched, ever considered, or was already working on a fantasy sports network concept by

itself or with someone else.  Berlin who had been working for DIRECTV for 15 years, responded in the negative and stated she thought it sounded like a good idea.

14.    Based on Berlin's assurance that DIRECTV was not working on or considering a fantasy sports television network, Friedman spent the balance of the year 2012 creating the FSZ ("FSZ Concept") and eventually he formed Plaintiff FSZ Media, LLC.  Plaintiffs engaged a consultant to create a business plan; developed a power point presentation describing his channel and containing third party research to show the popularity of fantasy sports and the sizeable potential audience for a fantasy sports network (known in the entertainment industry as a "deck"); and produced a three-minute sizzle reel depicting what the network would look like.

15.    On February 13, 2013, at Berlin's invitation, Friedman and Berlin met at DIRECTV's offices in El Segundo, California at which time Friedman submitted to and discussed with Berlin, in confidence, his power point presentation, business proposal, and sizzle reel, and he described the FSZ Concept in detail.

16.    On or about February 19, 2013, Friedman asked Berlin again if defendants were working on, either by themselves or through a third-party proposal, a fantasy sports network.  Berlin again assured Friedman that the answer was no.

17.    On April 8, 2013, Plaintiffs sent Berlin, at the latter's request, the first draft of a Letter of Intent.

18.    On April 23, 2013, Friedman met with Berlin and other programming and marketing employees of DirecTV, at her invitation, in Las Vegas in the DIRECTV suite.  Friedman was asked to present the FSZ Concept again and he did so.  His presentation received an enthusiastic response from all DIRECTV employees in attendance.

19.    On June 11, 2013, Plaintiffs were asked to meet with Vince Torres ("Torres"), who was Vice President, Revenue Planning and Strategy for DIRECTV, to present the FSZ Concept to Torres. The meeting took place in Washington D.C.  After the presentation, Torres said he loved the idea.  He took the deck and asked Plaintiffs to email him another copy which he would give to Alex Kaplan ("Kaplan"), who was

Senior Vice President of Revenue and Marketing for DIRECTV. Plaintiffs are informed and believe, and on that basis allege, that Kaplan's job was at least in part to oversee DIRECTV's sports programming. Plaintiffs complied.

20. On July 20, 2013, Plaintiffs were asked to send Kaplan information and documentation on the FSZ Concept, along with a proposal. Plaintiffs did so.

21. On August 1, 2013, Kaplan told Plaintiffs that he really liked the FSZ Concept but needed proof that Plaintiffs could execute on the business plan and therefore Kaplan asked to see a sample episode of the show. Plaintiffs agreed to send one. Kaplan asked if Plaintiffs could secure highlights from the previous night's games, and Plaintiffs said they could do so. Plaintiffs also discussed with Kaplan the quality of the programming and on what "tier" within DIRECTV that it would be placed. Kaplan said the price proposed by Plaintiffs was a little too high, so the parties discussed and negotiated the financial terms of a deal depending on which "tier" within DIRECTV the FSZ channel would be placed. Finally, Plaintiffs asked Kaplan, as they had asked Berlin, if DIRECTV was already considering any programming in the fantasy sports world and Kaplan said no, he was busy on other matters.

22. On August 14, 2013, Robert Stecklow ("Stecklow"), who reported to Kaplan and was General Manager of Sports Products and Marketing of DIRECTV, contacted Plaintiffs to advise that Kaplan and Torres wanted Plaintiffs to meet with him. On August 20, 2013, Stecklow advised Plaintiffs the FSZ Concept looked like a good fit for DIRECTV's new sports tier.

23. On August 20, 2013, Stecklow called Plaintiffs to further discuss the FSZ Concept and to tell Plaintiffs that it looked like a good fit for DIRECTV's upcoming revision to its sports tier.

24. On September 6, 2013, Plaintiffs sent to Kaplan, Torres, and Stecklow, at their request, the video of a sample episode that Plaintiffs had produced based on Friedman's conversations with Kaplan.

25. On September 9, 2013, Plaintiffs spoke with Emma Brackett ("Brackett"), Vice President, Content and Programming for DIRECTV, and the parties discussed the FSZ Concept.

26. On September 17, 2013, Plaintiffs received an email from Reagan Feeney ("Feeney"), Vice President, Programming Acquisitions for DIRECTV, thanking them for the video and other materials.

27. On November 5, 2013, Plaintiffs sent Feeney their press release about the launch of the FSZ network which led to a phone conversation with Feeney in which they discussed the details of Plaintiffs' "deck". Feeney told Plaintiffs that DIRECTV was thinking about revising its "sports tier" and that the FSZ Concept would be a good fit for the tier.

28. Starting on December 5, 2013, Plaintiffs had a number of phone conversations with Josh Stern, Senior Director, Advertising and Sponsorships for DIRECTV, in which they discussed, among other issues relative to the FSZ Concept, filming the fantasy draft party at Buffalo Wild Wings, which was a major customer of DIRECTV.

29. On January 23, 2014, Plaintiffs were scheduled to meet with Paul Guyardo ("Guyardo"), Executive Vice President and Chief Revenue and Marketing Officer for DIRECTV. Guyardo was the "second in command" at DIRECTV. Plaintiffs believed that the purpose of the meeting was to discuss the deal between Plaintiffs and DIRECTV for the FSZ Concept. At the last moment, DIRECTV asked to reschedule the meeting on the grounds that Guyardo was unexpectedly called away to California.

30. Before the meeting with Guyardo could be held, on February 12, 2014, Plaintiffs were unexpectedly notified that DIRECTV was passing on the FSZ Concept, that Kaplan had concluded DIRECTV was not interested in a fantasy sports channel because he felt it was more of a web-based commodity. In truth, although the information was withheld from Plaintiffs, by February 2014, based on the ideas and

materials Plaintiffs had disclosed, Defendants had decided to launch their own fantasy sports channel thereby eliminating any need to pay Plaintiffs.

31. On or about July 7, 2014, a press release was issued by Defendants announcing the launch of the "Fantasy Zone Channel," which they referred to as "FZC," which would be dedicated to fantasy sports across the United States and wholly owned by DIRECTV. In October 2014, Kaplan was quoted in Forbes Magazine saying that DIRECTV had been working on a new fantasy sports channel for two years based on in-depth research he had performed. Plaintiffs contacted DIRECTV to complain but were told that Kaplan did not remember Plaintiffs. The FZC debuted on DIRECTV for the fall 2014 NFL football season.

## FIRST CLAIM FOR RELIEF

**(Breach of Implied-In-Fact Contract Against All Defendants)**

32. Plaintiffs reallege and incorporate herein by this reference each of the allegations made above in paragraphs 1 through 31 of this Complaint.

33. Plaintiffs' purpose for contacting Berlin in 2012, meeting her in early 2013, and having those subsequent communications with her colleagues which are described above, was to sell their ideas for the FSZ channel to DIRECTV. At the time, Berlin, Kaplan, Torres, Stecklow, Feeney and the other DIRECTV representatives with whom they met or spoke, were all aware of and understood Plaintiffs' purpose, and that Plaintiffs did not intend to bestow a mere gratuity on DIRECTV. Defendants knew and impliedly agreed, before hearing and seeing the presentation, that Plaintiffs must be paid reasonable compensation and receive appropriate credit, per entertainment industry customs and practices, if Defendants used the ideas disclosed by Plaintiffs to create their own fantasy sports channel. By reason of the foregoing, an implied-in-fact contract was formed between Defendants and Plaintiffs which included the foregoing terms.

34. In developing the FZC, Defendants used the ideas for the FSZ channel which were disclosed to them by Plaintiffs. The disclosures were made in writing, in meetings, and in countless telephone conversations and emails between late 2012 to

February 2014, as alleged above. The FZC owned by Defendants is substantially similar to the FSZ Concept disclosed by Plaintiffs. Defendants failed to pay for their use of Plaintiffs' ideas, and they failed to afford Plaintiffs any credit. The failure to pay and afford credit constituted a breach of the parties' implied-in-fact contract.

35. Plaintiffs performed each and every term and condition of the implied-in-fact contract to be performed on their part.

36. As a direct and proximate result of the foregoing breach of contract, Plaintiffs have been damaged in an amount which cannot presently be calculated with certainty but which is believed to be the approximate sum of $200,000,000 according to proof.

## SECOND CLAIM FOR RELIEF

### (For Breach of Confidence Against All Defendants)

37. Plaintiffs reallege and incorporate herein by this reference each of the allegations made above in paragraphs 1 through 34.

38. The ideas disclosed by Plaintiffs to Defendants were novel, and the disclosures were all made in confidence as per entertainment industry customs and practices. At the time of the disclosures, Defendants knew and understood the disclosures were being made in confidence and they agreed to maintain the confidence. Plaintiffs' purpose for contacting Berlin in 2012, meeting with her in early 2013, and having those subsequent communications with her colleagues which are described above, was to sell their ideas for the FSZ channel to DIRECTV, which purpose was understood

by Berlin, Kaplan, Torres, Stecklow, Feeney, and all other DIRECTV representatives with whom Plaintiffs had any communications in 2012, 2013, and 2014.

39. At all times described above Defendants knew the disclosures by Plaintiffs were all made in confidence and that Plaintiffs' ideas could not be disclosed by DIRECTV to any third parties without the prior knowledge and approval of Plaintiffs, which approval was never requested or given.

40. Defendants committed a breach of confidence by disclosing the ideas submitted by Plaintiffs, without the latter's knowledge or consent, to third parties so that the FZC could be created and operate.

41. As a direct and proximate result of the foregoing breach of confidence, Plaintiffs have been damaged in an amount which cannot presently be calculated with certainty but is believed to be the approximate sum of $200,000,000 according to proof.

## THIRD CLAIM FOR RELIEF

### (For Fraud Against All Defendants)

42. Plaintiffs reallege and incorporate herein by this reference each of the allegations made above in paragraphs 1 through 29.

43. When Kaplan and Berlin told Plaintiffs, on behalf of DIRECTV, that DIRECTV had not considered and was not working on a fantasy sports network concept by itself or with others, as alleged in paragraphs 13, 16, and 21 hereof, the statements were false and known by DIRECTV, Kaplan and Berlin to be false when made. The statements were made with an intent to defraud. As Kaplan acknowledged in the media,

DIRECTV had been working on the FZC for at least two years. The misrepresentations were made to Plaintiffs to induce them to share with DIRECTV their business plan and valuable market research to further DIRECTV's efforts to launch its own fantasy sports network, and to discourage Plaintiffs from selling the Concept to one of DIRECTV's competitors who might reach the market first.

44. Plaintiffs reasonably relied on the misrepresentations by, among other things, spending time and money during the year 2012 to develop their business plan, sharing their very detailed business plan which included their extensive market research with DIRECTV, producing a prototype episode based on the FSZ Concept, and spending the entire year 2013 meeting with various DIRECTV executives at different locations and communicating with them by phone and email. But for the misrepresentations, Plaintiffs would not have done any of these things.

45. As a direct and proximate result of the foregoing fraud, the market value of the FSZ Concept has been destroyed and they have been damaged in an amount which cannot be calculated with certainty but which is believed to be the approximate sum of $200,000,000 according to proof.

46. As a direct and proximate result of the foregoing fraud, DIRECTV is liable for punitive damages under Section 3294 of the California Civil Code in the amount of $500,000,000 or such other sum as may be proven at the time of trial.

## FOURTH CLAIM FOR RELIEF

### (For Negligence Against All Defendants)

47. Plaintiffs reallege and incorporate herein by this reference each of the allegations made above in paragraphs 1 through 29.

48. When Kaplan and Berlin told Plaintiffs that DIRECTV had not considered and was not working on a fantasy sports network concept by itself or with others, as alleged in paragraphs 13, 16, and 21 hereof, the statements were false and DIRECTV, Kaplan and Berlin knew or should have known they were false at the time. The statements constituted negligent misrepresentations. As Kaplan acknowledged in the media, DIRECTV had been working on the FZC for at least two years. The misrepresentations were made to Plaintiffs to induce them to share with DIRECTV their business plan and valuable market research to further DIRECTV's efforts to launch its own fantasy sports network, and to discourage Plaintiffs from selling the Concept to one of DIRECTV's competitors who might reach the market first.

49. Plaintiffs reasonably relied on the misrepresentations by, among other things, spending time and money during the year 2012 to develop their business plan, sharing their very detailed business plan which included their extensive market research with DIRECTV, producing a prototype episode based on their Concept, and spending the entire year 2013 meeting with various DIRECTV executives at different locations and communicating with them by phone and email. But for the misrepresentations, Plaintiffs would not have done any of these things.

50. As a direct and proximate result of the foregoing negligence, the market value of Plaintiff's concept has been destroyed and they have been damaged in an amount which cannot be calculated with certainly but which is believed to be the approximate sum of $200,000,000 according to proof.

WHEREFORE, plaintiff prays for judgment as follows:

### ON THE FIRST, SECOND AND FOURTH CLAIMS

1. For damages according to proof but presently estimated to be approximately $200,000,000;

### ON THE THIRD CLAIM

2. For damages according to proof but presently estimated to be approximately $200,000,000;

3. For punitive damages in the sum of $500,000,000 or such other sum as is proven at trial;

### ON ALL CLAIMS

4. For interest as provided by law;

5. For its costs of suit; and

6. For such other and further relief as the court deems just and proper.

Dated: February 5, 2015        KULIK GOTTESMAN & SIEGEL LLP

                               By:  /s/ *Glen L. Kulik*
                                    Glen L. Kulik
                                    Attorneys for Plaintiffs

## REQUEST FOR JURY TRIAL

Plaintiffs hereby request a jury trial on all claims and issues which may be tried to a jury, as provided by Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: February 5, 2015                KULIK GOTTESMAN & SIEGEL LLP


By:   /s/ *Glen L. Kulik*
        Glen L. Kulik
        Attorneys for Plaintiffs